1  Michael J. Manning, Esq. (SBN 286879)
2  **MANNING LAW, APC**
   26100 Towne Centre Drive
3  Foothill Ranch, CA 92610
   Office: (949) 200-8755
4  Email: privacy@manninglawoffice.com

5
6  Reuben D. Nathan, Esq. (SBN 208436)
   **NATHAN & ASSOCIATES, APC**
7  2901 W. Coast Hwy., Suite 200
   Newport Beach, CA 92663
8  Office: (949) 270-2798
9  Email: rnathan@nathanlawpractice.com

10 Ross Cornell, Esq. (SBN 210413)
11 **LAW OFFICES OF ROSS CORNELL, APC**
   40729 Village Dr., Suite 8 - 1989
12 Big Bear Lake, CA 92315
   Office: (562) 612-1708
13 Email: rc@rosscornelllaw.com

14
15 Attorneys for Plaintiff: MURPHY MARTINES

16
17                **UNITED STATES DISTRICT COURT**
18                **CENTRAL DISTRICT OF CALIFORNIA**
19

| | |
|---|---|
| 20  MURPHY MARTINES, an individual, | Case No: |
| 21 | |
| 22              Plaintiff, | **COMPLAINT** |
| 23  v. | 1. Cal. Penal Code § 638.51 |
| | 2. Cal. Constitution Art. I § 1 |
| 24 | 3. Cal. Civil Code § 1798.100, *et seq.* |
| 25  THE PEP BOYS--MANNY, MOE AND JACK, LLC, a Delaware | 4. Cal. Bus. & Prof. Code § 17200, *et seq.* |
| | 5. Intrusion Upon Seclusion |
| 26  limited liability company; and DOES 1-10, inclusive, | 6. Unjust Enrichment |
| 27 | |
| 28              Defendants. | **CLASS ACTION** |

# I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.pepboys.com (the "Website"), a website that Defendant owns and operates.

2.    Plaintiff MURPHY MARTINES files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against THE PEP BOYS--MANNY, MOE AND JACK, LLC ("Defendant" or "Pep Boys"), a Delaware limited liability company that owns and operates the Website.  Plaintiff brings this action based upon personal knowledge of the facts pertaining to him, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

3.    Pep Boys surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

4.    To achieve these goals, Pep Boys enables third-party technologies that function as unlawful pen registers and/or trap and trace devices, capturing detailed information about users' electronic communications—such as IP addresses, session data, clickstream activity, and form inputs—in real time. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA") where, as here, Plaintiff and Class Members did not consent to the interception, nor did Defendant secure a court order permitting such surveillance.

5.    A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website to monitor user interactions. These trackers typically take the form of a small, invisible image (often 1x1 pixels in size) or a lightweight JavaScript snippet that executes when a user loads a webpage or completes an action. When triggered, the pixel sends data—such as page views, session duration, referrer URLs, IP

CLASS ACTION COMPLAINT

address, and browser details—from the user's browser to a third-party server. Pixel trackers are widely used in digital marketing and analytics to assess user engagement, measure campaign performance, and personalize advertising.

6.      When users visit the Website, Defendant causes trackers to be embedded on Website visitors' internet browsers, including but not limited to:

- Facebook Tracker
- Google Analytics Tracker
- Twitter Tracker
- AdRoll Tracker
- The Trade Desk Tracker
- KeyMetric Tracker

7.      The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies that go beyond Defendant's direct needs for their own financial gain.  The above-listed trackers are referred to herein collectively as the "Trackers."

8.      The Trackers are operated by separate and distinct third parties, including Meta Platforms, Inc. (Facebook Tracker), Google LLC (Google Analytics Tracker), X Corp. (Twitter Tracker), NextRoll, Inc. (AdRoll Tracker), The Trade Desk, Inc. (The Trade Desk Tracker) and KeyMetric, Inc. (KeyMetric Tracker) (collectively, the "Third Parties").  Defendant enables the Trackers, which cause user data to be transmitted to third-party servers to collect Website visitors' IP address and other information, to identify them, and to facilitate the monetization of user data through targeted marketing and advertisement brokerages.

9.      Through the Trackers, the Third Parties collect Website users' information including IP addresses, device and browser type, screen resolution, operating system, pages visited, time spent on each page, scroll depth, mouse movements, clicks, referring URLs, unique identifiers (such as cookies and advertising

CLASS ACTION COMPLAINT

IDs), geographic location based on IP, user session duration, form interactions, and behavioral data used for profiling, ad targeting, cross-device identification, and/or real-time bidding (the "User Information"). Defendant and the Third Parties then use the User Information for hyper-targeted marketing and advertising and to generate revenue.

10.     Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device fingerprints, and other non-content signaling metadata, they qualify as "pen registers" and/or "trap and trace devices." Cal. Penal Code § 638.50.  These trackers operate without user engagement and silently intercept routing and addressing information for commercial purposes.  *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

11.     Plaintiff and the Class Members did not consent to the Trackers being installed, executed, embedded or injected on their devices and did not expect disclosure and/or monetization of their information.  By installing and using the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

12.     Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents.

13.     Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.     PARTIES

14.     Plaintiff MURPHY MARTINES ("Plaintiff") is a California citizen residing in Los Angeles County and has an intent to remain there.  Plaintiff was in California when he visited the Website, which occurred on multiple instances during the class period prior to the filing of the complaint in this matter.  The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

15.     Pep Boys owns, operates and/or controls the Website which is an online platform that offers goods and services to consumers.

/ /

CLASS ACTION COMPLAINT

16.     Pep Boys is a leading automotive service provider and aftermarket parts retailer. Pep Boys connects consumers to automotive repair, maintenance, tire installation, and a variety of car care solutions through its extensive service center network. The company also offers a range of automotive parts, tools, and accessories through retail locations and its online platform. Pep Boys is one of the most established and recognized brands in the automotive service industry.

17.     Pep Boys' national presence is supported by a vast network of over 850 locations and more than 8,000 service bays. The company employs thousands of technicians who offer services such as preventative maintenance, tire services, oil changes, diagnostics, and mechanical repairs. Pep Boys' inventory includes tires, batteries, brakes, engine parts, and accessories for a wide variety of vehicles, ranging from passenger cars and trucks to fleet and commercial vehicles.

18.     Pep Boys' primary sales channels include both in-person service centers and online platforms. The Website serves as a hub for customers to research automotive services, schedule appointments, browse tire selections, and shop for parts and accessories. Website users are able to access features such as service pricing, tire recommendations, appointment scheduling, and special promotions designed to enhance convenience and drive customer loyalty.

## III.     JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

20.     This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents,

CLASS ACTION COMPLAINT

including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

21.     Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and the injury to Plaintiff occurred within this District.

## IV.    GENERAL ALLEGATIONS

### 1.    *The California Invasion of Privacy Act (CIPA)*

22.     Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

23.     CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

24.     A "pen register" is defined as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

25.     Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

CLASS ACTION COMPLAINT

26.    In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

27.    Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing numbers dialed from a specific line and trap and trace devices recording incoming call numbers to that line.

28.    Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line—essentially capturing the user's outgoing information.

29.    Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line—capturing the incoming information.

30.    Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

31.    The alleged conduct by the defendant constitutes an invasion of a legally protected interest that is both concrete and particularized. Violations of the right to privacy have long been actionable at common law (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019)). The right to privacy encompasses an individual's control over personal information (*Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)).

32.    Both legislative history and statutory text indicate that Congress and the California Legislature intended to protect these historical privacy rights when enacting CIPA (Cal. Pen. Code § 630). Therefore, CIPA codifies a substantive right to privacy,

CLASS ACTION COMPLAINT

the violation of which results in a concrete injury sufficient to confer standing (*Campbell v. Facebook, Inc.*, —F.3d—, 2020 WL 1023350, at *7–8; *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020)).

33.    Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

### 2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"*

34.    When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources—including HTML, cascading style sheets (CSS), JavaScript files, and image assets—used by the browser to render and display the webpage. These resources also included client-side scripts that initiate communication with third-party services for analytics, marketing, and tracking purposes. *Figure 1* below illustrates sample HTTP requests.

### *Figure 1*



35.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data — typically via HTTPS requests — to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data—referred to as User Information—included identifiers such as IP

CLASS ACTION COMPLAINT

addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

36.    The Trackers operate by initiating HTTP or HTTPS requests—using either the GET or POST method—from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

37.    An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices and can be used—via external geolocation services—to infer a user's general location, including state, city, and in some cases, ZIP code.

38.    Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

39.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

/ /

CLASS ACTION COMPLAINT

40. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting—particularly when combined with other tracking identifiers and third-party enrichment.

41. A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

42. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

43. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

**3.    *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

44. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing

session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

45.     This process, known as digital fingerprinting, involves compiling various data points—such as browser version, screen resolution, installed fonts, device type, and language settings—to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

46.     When combined with additional tracking mechanisms—such as cookies, login data, and third-party enrichment services—fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint—especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases—can enable the reidentification of a user.

47.     The ability to associate a persistent digital profile with a specific individual—using techniques such as digital fingerprinting—has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

48.     In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics—information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking

CLASS ACTION COMPLAINT

technologies like the Trackers installed, executed, embedded or injected in the Website, which operate without user interaction or visibility.

49.    The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

50.    When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header.  In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

### 4.    *Plaintiff And Class Members' Data Has Financial Value*

51.    Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

52.    Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[2]

//

//

---

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[2] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

CLASS ACTION COMPLAINT

53.    There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[3]

54.    Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

55.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[5]

/ /

/ /

---

[3] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring  Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

CLASS ACTION COMPLAINT

56.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[6]

57.    The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

### 5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent*

58.    By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with.  This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms, allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

59.    Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data—such as IP

---

[6] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

CLASS ACTION COMPLAINT

address, device type, screen resolution, and referral information—to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

60.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

61.    IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

62.    When users' data is collected without meaningful consent and monetized, they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers—such as IP addresses, device IDs, and cookies—with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

/ /

CLASS ACTION COMPLAINT

**6.**    ***The Trackers Function Together to Achieve Targeted Objectives***

63.    When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

64.    On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

65.    Pep Boys integrates a range of third-party tracking technologies on its Website—including tools from Facebook, Google Analytics, DoubleClick, Twitter, AdRoll, Trade Desk, and KeyMetric—to collect detailed behavioral data from users without providing adequate notice or obtaining meaningful consent. These trackers capture sensitive information such as page views, clicks, purchases, form inputs, session behaviors, and website navigation patterns, often in real time. The data collected is linked to persistent identifiers and device information, allowing third parties to build extensive user profiles that can be tracked across different platforms, devices, and websites.

66.    These tracking tools enable Pep Boys to engage in highly targeted advertising by creating detailed audience segments and retargeting users who have previously interacted with the Website. For example, through the Meta (Facebook) Pixel, DoubleClick, and Trade Desk integrations, Pep Boys can deliver personalized advertisements across Facebook, Google Display Network, Twitter, and other platforms

based on users' on-site behavior. The trackers facilitate cross-platform ad targeting, enabling Pep Boys to optimize marketing campaigns by focusing on users' specific interests, demographics, and purchasing behaviors, and thereby increasing advertising efficiency.

67. In addition to advertising, the data collected via these trackers supports Pep Boys' data-driven marketing strategies, allowing for performance analytics, audience modeling, and optimized advertising spend. Tools like KeyMetric provide enhanced call tracking and user behavior analytics, while AdRoll and Trade Desk facilitate dynamic retargeting campaigns and real-time bidding on ad exchanges. By aggregating behavioral and interaction data, these platforms allow Pep Boys to fine-tune its marketing strategies, predict customer behavior, and maximize return on investment through precision-targeted outreach and re-engagement initiatives.

68. Pep Boys uses these third-party trackers to collect, transmit, and leverage behavioral and demographic data from Website visitors, which supports broader monetization strategies through advertising partnerships, audience expansion programs, and participation in programmatic advertising ecosystems. Through integrations with platforms like Meta, Google, AdRoll, and Trade Desk, Pep Boys facilitates the development of consumer profiles that are used to drive lookalike audience targeting, performance analytics, and real-time ad optimization. These detailed consumer insights help fuel customer acquisition efforts, improve marketing effectiveness, and may also contribute to the broader data ecosystems maintained by its third-party tracking partners.

## V.    **SPECIFIC ALLEGATIONS**

### 1.    *The Facebook Tracker*

69. Pep Boys uses the Facebook Tracker to monitor user behavior and retarget visitors across the Facebook platform and its affiliated networks, such as Instagram. By embedding the Facebook Pixel and associated tracking scripts, the Website captures user activities such as page views, button clicks, form submissions,

CLASS ACTION COMPLAINT

and purchase events. This data allows Facebook to associate specific user actions on the Pep Boys site with user profiles on its social media platforms, thereby supporting identity resolution. It also enables Pep Boys to deliver personalized advertisements on Facebook and Instagram to users who have previously interacted with the Website, enhancing the precision and return on investment (ROI) of its digital advertising campaigns.

70.    The Facebook Tracker collects device identifiers and network-level information, including IP addresses, browser types, operating systems, and other metadata. This information helps Facebook connect on-site behaviors to individual Facebook user accounts or devices, even if users are not logged into Facebook at the time of interaction. Through this mechanism, Facebook facilitates robust identity resolution and behavioral profiling, enabling Pep Boys to access detailed ad performance insights, conversion tracking metrics, and audience segmentation tools to optimize its marketing and retargeting strategies across Facebook's advertising ecosystem.

71.    ***Figure 2*** below is a screenshot from the Website, which shows a network request to Facebook's tracking endpoint, indicating that the Facebook Pixel is active on the Website. The request is a GET call sent to Facebook's servers and contains tracking parameters used for Facebook's advertising and analytics services. This request occurs immediately upon page load:

//

//

CLASS ACTION COMPLAINT

*Figure 2*



72.     *Figure 3* below is a screenshot of web activity on the Website, which shows a DNS request to www.facebook.com, confirming that the user's device attempted to resolve the domain associated with Facebook's tracking services. This system-level trace demonstrates that a connection to Facebook's backend infrastructure was initiated, independent of any visible activity in the browser's user interface. The successful DNS resolution indicates that the browser was preparing to send tracking data to Facebook:

/ /

/ /

19

***Figure 3***



73.    The Facebook Tracker is at least a "process" because it is software that identifies consumers, gathers behavioral and device data, and correlates that information across Facebook's advertising and analytics networks.

74.    The Facebook Tracker is at least a "device" because in order for software to function, it must be executed on some form of computing device, such as a smartphone, tablet, or personal computer. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

75.    The Facebook Tracker functions as a pen register and/or trap and trace device because it is designed to capture the addressing, routing, and signaling information of electronic communications between users and the Website. Specifically, it collects information such as IP addresses, device identifiers, URL paths, timestamps, and referrer data—tracking the origin and destination of user interactions without necessarily capturing the substantive content of communications, thus fitting the statutory definitions.

76.    Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Facebook Tracker or to collect and share their data with Meta Platforms, Inc.

CLASS ACTION COMPLAINT

77.    Defendant's undisclosed use and installation of the Facebook Tracker on the Website violates CIPA's prohibitions on the unauthorized use of a pen register and/or trap and trace device without the required prior consent or judicial authorization.

**2.    *Google Analytics Tracker***

78.    The Google Analytics Tracker (www.google-analytics.com) is associated with Google's analytics platform and is formally known as Global Site Tag (gtag.js) or Google Analytics 4 (GA4). It is part of Google's suite of website measurement and performance optimization tools.

79.    The Google Analytics Tracker allows the Website to track user behavior (e.g., page views, clicks, conversions) and send that data back to Google's analytics platform for performance measurement, remarketing, audience segmentation, event tracking, and user flow analysis across devices and sessions.

80.    The Website uses the Google Analytics Tracker through requests to www.google-analytics.com to monitor and collect detailed information about user interactions across its pages. When a user visits the Website, it automatically captures behaviors such as page loads, button clicks, time spent on site, scrolling behavior, and e-commerce activity. This behavioral data is transmitted to Google's analytics servers, where it is associated with session identifiers, client IDs, and device-specific characteristics to support user profiling and targeted advertising strategies.

81.    ***Figure 4*** below is a screenshot from the Website, which shows a network request captured in DevTools to www.google-analytics.com, confirming that the Google Analytics Tracker is active on the Website. The request is a POST call that includes payload parameters such as session information, client ID, screen resolution, and event timestamps. This network request occurs immediately upon page load:

/ /

/ /

CLASS ACTION COMPLAINT

*Figure 4*



82.    *Figure 5* below is screenshot of web activity on the Website, which shows a DNS request to www.google-analytics.com, confirming that the Website initiated a domain-level access attempt to Google's analytics infrastructure at the network layer. The presence of this DNS packet demonstrates that the system attempted to resolve Google's tracking domain independently of any visible user interaction, validating that backend tracking infrastructure is engaged immediately upon a user's visit to the Website:

//

//

CLASS ACTION COMPLAINT

***Figure 5***



83. The Google Analytics Tracker enables Pep Boys to collect detailed behavioral data to support identity resolution by linking user actions to Google Advertising IDs or user profiles across sessions and devices. This tracking facilitates targeted advertising through Google Ads, improves remarketing strategies, enhances audience modeling capabilities, and contributes to Pep Boys' data monetization efforts by optimizing marketing performance, increasing return on ad spend, and refining customer acquisition programs.

84. Defendant surreptitiously installed, executed, embedded, or injected the Google Analytics Tracker by copying a JavaScript code snippet and adding it to the Website's source code. When a user visits the Website, their browser automatically executes the Google Analytics JavaScript, causing data about the user's interactions—including IP address, client ID, page paths, timestamps, and screen metadata—to be sent directly to Google's servers.

85. The Google Analytics Tracker is at least a "process" because it is software that identifies users, gathers behavioral and technical data, and correlates that information for profiling and analysis purposes.

//

//

CLASS ACTION COMPLAINT

86.    The Google Analytics Tracker is at least a "device" because, in order for software to operate, it must be executed on some form of computing device, such as a laptop, smartphone, or tablet. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

87.    The Google Analytics Tracker functions as a trap and trace device and/or pen register under the California Invasion of Privacy Act (CIPA) because it captures non-content metadata associated with users' electronic communications—including IP addresses, session IDs, device types, URLs visited, timestamps, and referrer information—without prior user consent or a court order. This metadata reflects the addressing and routing information involved in communications between users and the Website.

88.    Defendant never obtained a court order authorizing the installation of a pen register or trap and trace device and did not obtain the express or implied consent of Plaintiff or Class Members to install the Google Analytics Tracker on their browsers or to share their session metadata with Google.

89.    The Google Analytics Tracker violates CIPA's prohibitions regarding the unauthorized installation and use of a pen register and/or trap and trace device without proper consent or judicial authorization.

### 3.    *The Twitter Tracker*

90.    The Twitter Tracker (syndication.twitter.com) is associated with Twitter's advertising and syndication services and is part of Twitter's broader tracking and ad delivery infrastructure. It allows websites to integrate Twitter content, monitor user behavior, and facilitate targeted advertising across Twitter's platform.

91.    The Twitter Tracker enables the Website to track user behavior (e.g., page views, interactions, link clicks, conversions) and send this data back to Twitter's advertising system for remarketing, audience segmentation, cross-device targeting, and analytics. By tracking these behaviors, Twitter can associate site interactions with user profiles and deliver retargeted ads both on and off Twitter's platform.

CLASS ACTION COMPLAINT

92.    The Website uses the Twitter Tracker through requests to syndication.twitter.com to monitor and collect behavioral information about user interactions across its pages. When a user visits the Website, the Twitter Tracker automatically captures activities like page loads, embedded content interactions, and click events, which are transmitted to Twitter's backend servers and associated with user session data.

93.    *Figure 6* below is a screenshot from the Website, showing a network request to syndication.twitter.com, confirming that the Twitter Tracker is active on the Website. This network call indicates that Twitter's syndication script was triggered immediately upon page load without user interaction. The payload and outbound request confirm that Twitter began receiving information about the user's session automatically:

*Figure 6*



//

//

CLASS ACTION COMPLAINT

94.     *Figure 7* below is a screenshot of web activity on the Website, which shows a DNS request to syndication.twitter.com, confirming that the Website initiated a domain resolution attempt for Twitter's tracking infrastructure at the system level. The presence of this DNS packet demonstrates that the browser attempted to contact Twitter's servers to activate tracking scripts independently of any user action, validating that Twitter's backend connections were established:

*Figure 7*



95.     The Twitter Tracker enables Pep Boys to collect detailed behavioral data to support identity resolution by linking user interactions with Twitter Advertising IDs or device profiles. This data enhances Twitter's ability to deliver personalized ads and to build audience segments based on browsing behavior, ultimately optimizing Pep Boys' retargeting and marketing strategies across the Twitter platform.

96.     Defendant surreptitiously installed, executed, embedded, or injected the Twitter Tracker by adding a JavaScript tracking snippet to the Website's code. When a user visits the Website, their browser automatically runs the Twitter script, causing data about the user's session—including IP address, browser information, URL paths, and interaction events—to be sent to Twitter's servers.

/ /

CLASS ACTION COMPLAINT

97. The Twitter Tracker is at least a "process" because it is software that identifies users, collects interaction and technical data, and correlates that information to build behavioral profiles and optimize ad delivery.

98. The Twitter Tracker is at least a "device" because, for software to function, it must run on a computing device such as a laptop, smartphone, tablet, or personal computer. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

99. The Twitter Tracker functions as a trap and trace device and/or pen register under the California Invasion of Privacy Act (CIPA) because it captures non-content metadata associated with users' electronic communications—including IP addresses, timestamps, URLs visited, referrer information, and session identifiers.

100. Defendant never obtained a court order authorizing the installation of a pen register or trap and trace device and did not obtain the express or implied consent of Plaintiff or Class Members to install the Twitter Tracker on their browsers or to share their browsing behavior with Twitter.

101. The Twitter Tracker violates CIPA's prohibitions on the unauthorized installation and use of a pen register and/or trap and trace device without obtaining proper consent or judicial approval.

### 4. *The AdRoll Tracker*

102. The AdRoll Tracker (d.adroll.com or related subdomains) is associated with NextRoll, Inc., a digital marketing and retargeting company specializing in programmatic advertising and audience targeting. The AdRoll platform allows businesses to deliver personalized ads across websites, social media platforms, and connected TV devices.

103. The AdRoll Tracker enables the Website to track user behavior (e.g., page views, product views, cart activity, and conversions) and sends that behavioral data to AdRoll's advertising platform. This data supports dynamic retargeting,

CLASS ACTION COMPLAINT

personalized ad delivery, audience segmentation, lookalike audience modeling, and cross-device tracking for users who interact with the Website.

104.   The Website uses the AdRoll Tracker through requests to AdRoll domains to collect detailed information about user interactions across its pages. When a user visits the Website, the AdRoll script automatically fires, capturing session information such as visited URLs, timestamps, device type, and behavioral engagement metrics. This information is transmitted to AdRoll's servers, where it is associated with unique user identifiers and used to optimize advertising campaigns.

105.   ***Figure 8*** below is a screenshot from the Website, showing a network request to an AdRoll domain, confirming that the AdRoll Tracker is active on the Website. The request is an outbound GET call containing parameters such as session identifiers, device metadata, and page interaction information. This demonstrates that AdRoll's servers are receiving real-time user data immediately upon page load:

***Figure 8***



// //

// //

CLASS ACTION COMPLAINT

106.   **Figure 9** below is a screenshot of web activity on the Website, which shows multiple DNS queries for AdRoll-related domains, confirming that the Website initiated backend communications with AdRoll's tracking infrastructure. These DNS resolutions validate that connections to AdRoll's servers were made at the system level, independent of any visible activity within the browser's user interface:

*Figure 9*



107.   The AdRoll Tracker enables Pep Boys to collect and transmit behavioral data that supports identity resolution by linking user actions across sessions and devices. This data allows Pep Boys to leverage AdRoll's programmatic advertising ecosystem to deliver targeted ads, construct retargeting audiences, optimize ad spend, and enhance customer acquisition strategies through sophisticated audience modeling.

108.   Defendant surreptitiously installed, executed, embedded, or injected the AdRoll Tracker by embedding a JavaScript tracking script into the Website. When a user loads the Website, their browser executes the script, transmitting behavioral data—including IP addresses, session IDs, visited pages, and engagement signals—to AdRoll's advertising servers.

/ /

/ /

CLASS ACTION COMPLAINT

109.   The AdRoll Tracker is at least a "process" because it is software that identifies users, gathers behavioral data, and correlates that data to build detailed consumer profiles and enable predictive ad targeting.

110.   The AdRoll Tracker is at least a "device" because software must be executed on a computing device such as a smartphone, tablet, or computer to function. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

111.   The AdRoll Tracker functions as a trap and trace device and/or pen register under the California Invasion of Privacy Act (CIPA) because it captures non-content metadata associated with users' electronic communications—including IP addresses, session data, device information, and URLs visited—without obtaining prior user consent or securing a court order.

112.   Defendant never obtained a court order authorizing the installation of a pen register or trap and trace device and did not obtain express or implied consent from Plaintiff or Class Members to install the AdRoll Tracker on their devices or to transmit their behavioral data to AdRoll.

113.   The AdRoll Tracker violates CIPA's prohibitions regarding the unauthorized installation and use of a pen register and/or trap and trace device without prior consent or judicial approval.

### 5.    *The Trade Desk Tracker*

114.   The Trade Desk Tracker (match.adsrvr.org and js.adsrvr.org) is associated with The Trade Desk, Inc., a major programmatic advertising platform specializing in real-time bidding, audience segmentation, and cross-device targeting for digital advertisements. It enables advertisers to deliver personalized ads across websites, connected TVs, mobile apps, and other platforms.

115.   The Trade Desk Tracker enables the Website to monitor user behavior (e.g., page visits, interaction events, browsing patterns) and transmit that behavioral data to Trade Desk's ad exchange. This tracking facilitates dynamic retargeting, audience matching, user profiling, and campaign optimization by enabling the

CLASS ACTION COMPLAINT

association of anonymous identifiers with online activity across multiple platforms and sessions.

116.    The Website uses the Trade Desk Tracker by making network requests to match.adsrvr.org and loading scripts from js.adsrvr.org. These elements collect detailed information about user sessions, including IP addresses, user-agent strings, timestamps, and device identifiers. This behavioral data is then transmitted to Trade Desk's servers and is used to build profiles that optimize programmatic ad delivery and audience targeting strategies.

117.    ***Figure 10*** below is a screenshot from the Website, showing a network request to match.adsrvr.org/track/..., confirming that the Trade Desk Tracker is active on the Website. The request is an outbound GET call that includes user tracking identifiers and fields for consent flags, with consent values left empty. This demonstrates that Trade Desk is processing user identifiers and session data immediately upon page load:

***Figure 10***



CLASS ACTION COMPLAINT

118.   *Figure 11* below is a screenshot of web activity on the Website, which shows a DNS query to js.adsrvr.org, confirming that the Website initiated a domain-level connection to The Trade Desk's infrastructure early in the page load process. This DNS resolution occurred automatically at the system level, validating that the browser attempted to establish contact with Trade Desk's servers without any visible user interaction:

### Figure 11



119.   The Trade Desk Tracker enables Pep Boys to collect and transmit behavioral and technical data that supports identity resolution across devices and sessions. This allows Pep Boys to leverage Trade Desk's programmatic advertising ecosystem to deliver targeted ads, optimize media buying strategies, and improve customer acquisition efforts through real-time behavioral targeting and audience expansion.

120.   Defendant surreptitiously installed, executed, embedded, or injected the Trade Desk Tracker by incorporating JavaScript and pixel-based tracking code into the Website's backend. When users visit the Website, their browsers automatically execute these scripts, transmitting session metadata—including IP addresses, device information, session IDs, and browsing activity—to Trade Desk's servers.

CLASS ACTION COMPLAINT

121.    The Trade Desk Tracker is at least a "process" because it is software that identifies consumers, collects interaction data, and correlates that data across multiple sites and sessions to facilitate audience segmentation and targeted advertising.

122.    The Trade Desk Tracker is at least a "device" because in order to operate, software must be executed on a physical computing device, such as a laptop, smartphone, tablet, or desktop computer. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

123.    The Trade Desk Tracker functions as a trap and trace device and/or pen register under the California Invasion of Privacy Act (CIPA) because it captures non-content metadata—including IP addresses, URL paths, timestamps, device fingerprints, and session identifiers—without user consent or court order. This information constitutes the addressing, routing, and signaling information of users' communications with the Website.

124.    Defendant never obtained a court order authorizing the installation or operation of a pen register or trap and trace device and did not obtain the express or implied consent of Plaintiff or Class Members to install the Trade Desk Tracker or transmit their session data to The Trade Desk.

125.    The Trade Desk Tracker violates CIPA's prohibitions on the unauthorized installation and use of a pen register and/or trap and trace device without securing prior user consent or judicial approval.

### 5.    *The KeyMetric Tracker*

126.    The KeyMetric Tracker (keymetric.net and associated domains) is associated with KeyMetric, Inc., a provider of call tracking, lead attribution, and conversion analytics services. The platform allows businesses to monitor inbound call activity, online form submissions, and other customer interactions tied to marketing campaigns.

127.    The KeyMetric Tracker enables the Website to capture user behavior data such as page visits, form interactions, call events, and conversion metrics. By

associating this behavioral data with dynamic phone numbers and marketing channels, KeyMetric provides granular insights into how website visitors respond to digital marketing efforts.

128.    The Website uses the KeyMetric Tracker by loading JavaScript resources from KeyMetric's servers. These scripts are designed to monitor user interactions with call-to-action elements, dynamically swap phone numbers based on referral sources, and track lead attribution across sessions. Although the evidence captured to date confirms that the tracker loads, it is unclear whether full behavioral data transmission occurs during initial page load.

129.    *Figure 12* below is a  screenshot from the Website that shows a network request captured in DevTools to a KeyMetric server, confirming that the Website loads JavaScript tracking files from KeyMetric infrastructure. This loading event demonstrates that KeyMetric's tracking mechanisms were embedded into the Website's codebase:

### Figure 12



/ /

/ /

CLASS ACTION COMPLAINT

130.   The KeyMetric Tracker enables Pep Boys to potentially collect behavioral engagement data tied to marketing attribution models. This information would support performance measurement, lead generation analytics, and potentially contribute to broader marketing optimization efforts through integration with advertising and CRM systems.

131.   Defendant surreptitiously installed, executed, embedded, or injected the KeyMetric Tracker by including external JavaScript code sourced from KeyMetric's servers in the Website's structure. When a user visits the Website, their browser automatically loads this JavaScript, enabling tracking scripts to monitor interactions without user knowledge.

132.   The KeyMetric Tracker is at least a "process" because it is software that identifies consumer interactions, collects lead-related data, and correlates that information for marketing analytics purposes.

133.   The KeyMetric Tracker is at least a "device" because in order for the software to function, it must run on a computing device, such as a smartphone, tablet, or computer. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

134.   The KeyMetric Tracker, although currently observed with limited evidence of outbound transmission, still functions as a potential trap and trace device and/or pen register under the California Invasion of Privacy Act (CIPA) because it is designed to capture metadata related to user interactions—including source URLs, event timestamps, and dynamic phone call events.

135.   Defendant never obtained a court order authorizing the installation or operation of a pen register or trap and trace device and did not obtain the express or implied consent of Plaintiff or Class Members to install the KeyMetric Tracker or transmit any related session or interaction data to KeyMetric.

//

//

CLASS ACTION COMPLAINT

136.    The KeyMetric Tracker's installation on the Website violates CIPA's prohibitions regarding the unauthorized deployment of a pen register and/or trap and trace device without prior consent or judicial authorization.

## VI.    CLASS ALLEGATIONS

137.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's website during the relevant statute of limitations period.

138.    **NUMEROSITY:**  Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more.  The exact identities of Class Members can be ascertained by the records maintained by Defendant.

139.    **COMMONALITY:**  Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded or injected the Trackers on the Website;

- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;

- Whether Plaintiff and Class Members are subject to same tracking policies and practices;

- Whether Plaintiff and Class Members are entitled to statutory penalties;

- Whether Class Members are entitled to injunctive relief;

- Whether Class Members are entitled to disgorgement of data unlawfully obtained;

- Whether the Defendant's conduct violates the California Constitution;

- Whether the Defendant's conduct constitutes an intrusion upon seclusion;

- Whether the Defendant's conduct violates the Cal. Civil Code § 1178.100, *et seq.;*

- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice; and

- Whether Plaintiff and the Class Members are entitled to equitable relief for unjust enrichment.

140. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

141. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

142. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VII.    FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

### *By Plaintiff Against All Defendants*

143. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

144. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

CLASS ACTION COMPLAINT

145.    Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

146.    Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA.

147.    CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## VIII.    <u>SECOND CAUSE OF ACTION</u>

### Violations of Cal. Constitution Article I § 1

### *By Plaintiff Against All Defendants*

148.    Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

149.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

150.    Article I, Section 1 of the California Constitution guarantees each individual an inalienable right to privacy. This constitutional provision supports a private right of action against both governmental and private actors who engage in conduct that constitutes a serious invasion of privacy.

151.    Plaintiff and the Class Members possess a legally protected privacy interest in the confidentiality of their online behavior, communications metadata, and identifying information, including but not limited to: IP address, browser details, session identifiers, page visit patterns, and clickstream behavior.

152.    Plaintiff and the Class Members had a reasonable expectation that their activity on Defendant's website—including what pages were visited, what content was

interacted with, and when—would not be secretly tracked and transmitted to third parties via embedded surveillance code.

153.  Without Plaintiff's or the Class Members' knowledge or consent, Defendant caused the Trackers to be deployed on the Website.  The Trackers secretly transmitted Plaintiff's digital signaling data, addressing information (e.g., URLs accessed), and routing metadata (e.g., timestamps and referral paths) to the Third Parties, enabling behavioral profiling and cross-site identification.

154.  Defendant's conduct constitutes a serious and egregious invasion of Plaintiff's and the Class Members' informational privacy, far exceeding any routine or incidental data handling. The deployment of real-time surveillance tools designed to accomplish identity resolution and behavioral mapping is highly offensive to a reasonable person.

155.  Defendant lacked any legitimate justification for failing to disclose or obtain consent for this data interception and transfer. The magnitude of the privacy intrusion outweighed any speculative or commercial benefit to Defendant.

156.  As a direct and proximate result of Defendant's actions, Plaintiff and the Class Members have suffered a loss of control over personal data, emotional distress, and a violation of their constitutional right to privacy.

## IX.    <u>THIRD CAUSE OF ACTION</u>

### Violations of Cal. Civil Code § 1798.100, *et seq.*

### *By Plaintiff Against All Defendants*

157.  Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

158.  Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

159.  The CCPA grants consumers legal rights subject to statutory protection, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the

CLASS ACTION COMPLAINT

sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Ca. Civil Code § 1798.100 *et seq*.

160.    The CCPA defines "personal information" broadly to include "...information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civil Code § 1798.140.

161.    The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civil Code § 1798.115.

162.    Defendant collected Plaintiff's and Class Members' personal information with the purpose of resolving their identities and locating them for targeted marketing in the course of and as part of its business with California consumers.

163.    Disclosing Plaintiff's and Class Members' personal information was not reasonably necessary or proportionate to perform Defendant's reasonably expected online services.

164.    By collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice, Defendant violated CCPA.

165.    By failing to inform Plaintiff and Class Members of the personal information collected about them and that their personal information was shared with the Third Parties, Defendant violated CCPA.

## X.    **FOURTH CAUSE OF ACTION**

### **Violations of Business & Professions Code § 17200**

### ***By Plaintiff Against All Defendants***

166.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

167.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

168.   This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

169.   Defendant has engaged in unlawful business practices by:

(a) Violating Article I, Section 1 of the California Constitution, which protects individuals from serious invasions of privacy;

(b) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking; and

(c) Violating California Civil Code § 1798.100, *et seq.*, including collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice.  Privacy rights rooted in the CCPA are a protected interest enforceable under Business & Professions Code § 17200. *Briskin v. Shopify, Inc*., 101 F.4th 706 (9th Cir. 2025) (en banc).

170.   Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

171.   The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

172.   Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices.  On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform

CLASS ACTION COMPLAINT

users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

173.   As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data.  Plaintiff's and Class Members' data—used for targeted advertising, behavioral modeling, and enrichment by third parties—constitutes digital property with measurable economic value.

174.   Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## XI.    FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### *By Plaintiff Against All Defendants*

175.   Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

176.   Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

177.   Plaintiff and the Class Members bring this cause of action for intrusion upon seclusion, a well-established common law tort recognized in California, which protects individuals from intentional invasions of their private affairs in a manner that would be highly offensive to a reasonable person.

178.   At all relevant times, Plaintiff and the Class Members had a reasonable expectation of privacy in their online browsing activity, including their interactions with the Website, the specific content viewed, and the behavioral signals generated through use of the website—such as page views, click paths, session timestamps, and form entries.

179.   Without Plaintiff's or Class Members' knowledge or consent, Defendant intentionally deployed the Trackers on the Website. This tool was engineered to surreptitiously capture and transmit granular behavioral data—including addressing, signaling, and routing information such as IP addresses, URL paths, referrers, device attributes, and mouse activity—to third parties.

180.   The data collected was detailed and persistent, enabling Third Parties to monitor Plaintiff's and Class Members' conduct across websites, associate that behavior with unique identifiers, and build a behavioral profile of Plaintiff and Class Members for marketing and data monetization purposes.

181.   Defendant's actions were intentional, systematic, and designed to operate in a manner undetectable by users. At no point did Defendant provide clear, conspicuous disclosure of this surveillance, nor did it obtain affirmative consent from Plaintiff and Class Members to conduct such monitoring or transmit the collected data to third parties.

182.   The nature of this covert surveillance—especially its capacity to link online activity to identifiable users—would be highly offensive to a reasonable person, particularly in light of growing public sensitivity to privacy rights and digital surveillance.

183.   As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members suffered an invasion of privacy, loss of control over personal information, and emotional harm, including anxiety, indignity, and concern over being unknowingly tracked, profiled, and exposed to targeted advertising based on private digital conduct.

184.    Defendant's conduct was willful, malicious, and oppressive, thereby justifying the imposition of punitive and exemplary damages.

## V.    <u>SIXTH CAUSE OF ACTION</u>

### Unjust Enrichment

### *By Plaintiff Against All Defendants*

185.    Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

186.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

187.    Plaintiff and Class Members bring this cause of action for unjust enrichment, asserting that Defendant has been unjustly enriched through the unauthorized and uncompensated acquisition, use, and monetization of Plaintiff's and Class Members' personal data.

188.    Plaintiff and the Class Members, while visiting and interacting with the Website, unknowingly conferred a substantial benefit on Defendant by generating digital behavioral data, including but not limited to IP address, device information, browser metadata, URL paths, session timestamps, and interaction signals.

189.    Defendant deployed the Trackers without Plaintiff's and Class Members' knowledge or meaningful consent. The data collected was then used by Defendant and/or third parties to conduct behavioral targeting, analytics, and advertising optimization that generated substantial financial value.

190.    At no time did Plaintiff and Class Members consent to the commercial exploitation of this data. Nor were Plaintiff and Class Members informed that their online behavior would be tracked and monetized in this manner. Plaintiff and Class Members received no compensation, disclosure, or opportunity to prevent the enrichment conferred upon Defendant.

191.    Defendant's retention and use of this benefit was unjust and inequitable. The value of Plaintiff's and Class Members' behavioral data, when compiled, analyzed,

CLASS ACTION COMPLAINT

and integrated into advertising algorithms or consumer profiling tools, constitutes a marketable asset in the digital economy. Defendant's ability to extract revenue from this asset without disclosure or fair exchange renders its conduct unjust.

192.    Under principles of equity and good conscience, Defendant should be required to disgorge all ill-gotten gains and benefits received as a result of its unjust enrichment at Plaintiff's and Class Members' expense.

## VIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for the following:

1.    An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.    An order declaring that Defendant's conduct violates CIPA, and the California Constitution, Business & Professions Code § 17200;

3.    An order declaring that Defendant's conduct violates CCPA;

4.    An order declaring that Defendant's conduct unlawfully intrudes upon the seclusion of Plaintiff and the Class Members;

5.    An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;

6.    An order enjoining Defendant's conduct as alleged herein;

7.    Disgorgement of profits resulting from unjust enrichment;

8.    Statutory penalties;

9.    Prejudgment interest;

10.    Reasonable attorney's fees and costs; and

11.    All other relief that would be just and proper as a matter of law or equity.

/ /

/ /

CLASS ACTION COMPLAINT

1    **<u>DEMAND FOR JURY TRIAL</u>**

2    Plaintiff hereby demands a trial by jury.

3

4    Dated:    May 22, 2025            **MANNING LAW, APC**

5

6                                      By:  /s/ *Michael J. Manning*
                                           _____
7                                          Michael J. Manning, Esq.
                                           Attorneys for Plaintiff,
8                                          MURPHY MARTINES

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT